UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANAHEIM UNION HIGH SCHOOL DISTRICT,<br><br>                    Plaintiff,<br><br>        v.<br><br>J.E., a minor,<br><br>                    Defendant. | Case No. CV 12-6588- MWF (JCx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter came on for trial before the Court sitting without a jury on May 14, 2013.  Following the presentation of argument, the matter was taken under submission.

Having carefully reviewed the administrative record and the arguments of counsel, as presented at the hearing and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

## I. **FINDINGS OF FACT**

1. Plaintiff Anaheim Union High School District ("AUHSD") filed the Complaint in this matter on July 31, 2012, seeking reversal of Administrative Law Judge ("ALJ") Darrell Leplowsky's decision in the expedited portion of J.E.'s administrative proceeding challenging his placement. ("Expedited Decision" (AR 3:185-201)).

2. In 2012, J.E. was a student in the tenth grade and resided within the District with his mother, who is also his guardian ad litem. J.E. attended Kennedy High School.

3. At the time of the Expedited Decision, J.E. had not been found eligible for special education or related services.

4. J.E. had struggled with academics throughout his childhood and adolescence, and his ability to perform academically diminished as time passed.

5. Before he began high school at Kennedy, J.E.'s mother contacted school counselor Helen Yee to address preemptively J.E.'s challenges. J.E.'s mother communicated that J.E. suffered from anxiety and nervousness and had difficulty performing academically.

6. J.E. exhibited learning problems immediately following enrollment at Kennedy. In the ninth grade, while repeating Algebra 1, J.E. was unable to digest the material and complete his assignments. His instructor, Terence Rollerson, alerted J.E.'s mother and school counselors, and all agreed that J.E. required tutoring. J.E. barely passed the course and did not advance to the next level of mathematics.

7. J.E.'s writing became illegible and he exhibited irritability and agitation in classes. J.E. suffered a panic attack at one point in the ninth grade during Spanish instruction. His teacher, Mary Jesperson, escorted him to the health office and observed him hyperventilating and crying. Ms. Jesperson voiced her concern to J.E.'s mother and suggested that J.E. may benefit from a Section 504 plan (named for Section 504 of the Rehabilitation Act, codified at 29 U.S.C. §§ 701 *et seq.*).

8. J.E.'s anxiety worsened throughout ninth grade and he began treatment with a psychiatrist. He was diagnosed with anxiety and attention deficit hyperactivity disorder

("ADHD").  The psychiatrist prescribed medicine to treat J.E.'s diagnosed conditions, and J.E.'s mother discussed the diagnosis and treatment with Mr. Rollerson.

9.  After ninth grade, J.E.'s mental health further declined.  J.E. attempted suicide in the late summer of 2011 and was hospitalized for psychiatric treatment.  J.E.'s mother discussed these events with Linda Zubiate, a school employee and counseling staff member, who explained that J.E. was unlikely to qualify for special education because he did not have a history of disciplinary problems.

10.  J.E.'s mother subsequently requested a Section 504 plan for J.E.  J.E.'s psychiatrist wrote a letter on September 2, 2011, conveying J.E.'s diagnosis, advocating for a Section 504 plan, suggesting proposed accommodations, and noting that J.E. should have access to "any other special programs that the school offers to meet [his] needs."  J.E.'s mother faxed the letter to Ms. Yee on September 8, 2011, triggering initiation of the Section 504 plan process.

11.  The Section 504 plan meeting was held on September 22, 2011.  In attendance were J.E. and his mother, Ms. Yee, Assistant Principal Yousef Nasouf, and four of J.E.'s teachers – Colin Cornforth, Cynthia Esparza, David Wiskus, and Marlene Yu.  Each teacher discussed J.E.'s performance and comportment during the meeting, and common themes emerged:  J.E. frequently left the classroom, had significant trouble concentrating in class and organizing his work, did not complete his work, exhibited signs of nervousness and anxiety, and suffered from drowsiness caused by his medication.

12.  Prior to the Section 504 meeting, Mr. Wiskus approached Mr. Nasouf to discuss J.E.'s learning difficulties and the possibility of a reduced homework load.  (AR 1:150).

13.  After the teachers left the meeting, J.E., his mother, Ms. Yee, and Mr. Nasouf remained to discuss J.E.'s diagnosis of ADHD and anxiety and J.E.'s recent psychiatric hospitalization and suicide attempt.  The parties agreed that J.E.'s ADHD and anxiety negatively impacted his ability to focus and consequently impeded his ability to learn.

Ms. Yee stated that AUHSD was fairly certain that J.E. would qualify for a Section 504 plan even before receiving the psychiatrist's letter.

14. The parties developed a Section 504 plan that consisted of 14 accommodations tailored to address the issues raised at the meeting and implementing the psychiatrist's recommendations.

15. No one at the Section 504 plan meeting addressed the possibility of a special education evaluation or expressed concern that the Section 504 plan would be insufficient for J.E.

16. J.E.'s mental health problems continued to interfere with his learning in spite of the implementation of accommodations. His teachers were aware that J.E.'s mother heavily assisted his completion of homework.

17. After a disciplinary incident in mid-February 2012, J.E. was suspended and removed from Kennedy to a community day school.

18. J.E. thereafter filed a complaint under the Individuals with Disabilities Education Act ("IDEA"), arguing that he was entitled to the procedural protections available to special education students because AUHSD had a statutory "basis of knowledge" that J.E. was a child with a disability who potentially qualified for special services prior to the incident. AUHSD disagreed that it had a "basis of knowledge" as defined by the IDEA.

19. In the Expedited Decision, the ALJ concluded that while not all Section 504 plan meetings *per se* give rise to a "basis of knowledge" for the purposes of the IDEA, the information communicated by teachers to a school administrator in J.E.'s case satisfied the requirements of 20 U.S.C. § 1415(k)(5)(B)(iii), providing AUHSD with a "basis of knowledge" that J.E. was a child with a disability.

20. After the Expedited Decision, the ALJ issued a Non-Expedited Decision dated March 20, 2013 ("Non-Expedited Decision" (Docket No. 33-3)). In her Non-Expedited Decision, the ALJ ruled that AUHSD failed its child find obligations to J.E. under 20 U.S.C. § 1412(a)(3)(A) and the California Education Code. The ALJ concluded

that AUHSD should have evaluated J.E. for special education and related services shortly after the Section 504 plan meeting. Had it done so, the ALJ reasoned, AUHSD would have found that J.E. was eligible for special education and related services as a result of his emotional disturbance.

## II. CONCLUSIONS OF LAW

1. "In an action challenging an administrative decision, the IDEA provides that 'the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'" *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993) (quoting 20 U.S.C. § 1415(e)(2)). A district court reviews the decision of the IDEA hearing officer in an administrative proceeding under a modified *de novo* standard, giving due weight to the ALJ's conclusions, particularly where the administrative decision is "careful, impartial and sensitive to the complexities presented." *Id.* at 1472, 1476; *see also Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) ("We give deference to the administrative findings of the Hearing Officer particularly when, as here, they are thorough and careful.").

2. The reviewing court in an IDEA case "shall" include "additional evidence" where it is "non-cumulative, relevant, and otherwise admissible." *E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 652 F.3d 999, 1004-05 (9th Cir. 2011) ("[J]udicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." (quoting *Ojai Unified Sch. Dist.*, 4 F.3d at 1473)). "Additional evidence" includes "evidence concerning relevant events occurring subsequent to the administrative hearing." *Id.* at 1004.

3. The IDEA provides a variety of procedural and substantive educational protections to children with disabilities. For those who are not yet eligible for special education services, the IDEA provides that a child may seek to utilize disciplinary

protections afforded by the Act if the district "had knowledge . . . that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred." 20 U.S.C. § 1415(k)(5)(a).

4. There are three ways that a local educational agency can acquire a "basis of knowledge" (or "deemed knowledge") sufficient to extend the IDEA's procedural protections to a child not yet identified as disabled: (i) "the parent of the child has expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services"; (ii) "the parent of the child has requested an evaluation of the child pursuant to section 1414(a)(1)(B)"; or (iii) "the teacher of the child, or other personnel of the local educational agency, has expressed specific concerns about a ***pattern of behavior*** demonstrated by the child, directly to the director of special education of such agency or to other supervisory personnel of the agency." 20 U.S.C. § 1415(k)(5)(b) (emphasis added); *see also* 34 C.F.R. § 300.534.

5. The parties dispute the meaning of the term "pattern of behavior" and the scope of the concern that a teacher must communicate to trigger "deemed knowledge" under subpart (iii). There is very little case law to guide the Court on either point.

6. AUHSD urges the Court to construe a "pattern of behavior" as necessarily implicating disciplinary issues. Failure to do so, AUHSD argues, transforms all Section 504 plan meetings into "deemed knowledge" for the purposes of the IDEA. The Court will not use this construction of "pattern of knowledge" for several reasons, including the following:

*First*, the plain meaning of the words "pattern of behavior" does not support such a narrow reading. A pattern is ordinarily construed as recurrent, similar or related events. *See Caminetti v. U.S.*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law if within the constitutional authority of the lawmaking body which passed it, the sole function of the

courts is to enforce it according to its terms."). Behavior implicates outwardly observable characteristics and actions.

*Second*, having a disability does not always result in disciplinary problems. For example, counsel for J.E. explained that a child may exhibit severe forms of autism such that the child does not speak or engage but certainly does not act out or violate rules. A teacher may recognize that such a child has a disability and communicate that fact to an administrator without identifying any disciplinary problems.

*Third*, a plain-meaning construction of "pattern of behavior" does not eviscerate the distinction between a Section 504 plan meeting and subpart (iii) of 20 U.S.C. § 1415(k)(5)(b). Teachers may communicate isolated events at Section 504 plan meetings that do not create a pattern for the purposes of the IDEA. Or, the occurrences communicated may not factually put the district on notice that the child has a disability.

*Fourth,* none of the cases on which AUHSD relies hold otherwise.

7. The Court also rejects AUHSD's argument that the teacher referred to in subpart (iii) must specifically communicate that the child is in need of special education and related services or that the child should be evaluated for special education and related services. Congress included these conditions when delineating the ways in which a parent can trigger "deemed knowledge" in subparts (i) and (ii). That Congress did not see fit to include such a restriction in subpart (iii) supports a conclusion that Congress did not *intend* to limit subpart (iii) in the same manner as subparts (i) and (ii). Subparts (i) and (ii) show that Congress is capable of articulating these restrictions but chose not to do so in subpart (iii). Principles of statutory construction therefore compel the Court to give a broader effect to subpart (iii). *See, generally,* Singer & Singer, 2A *Sutherland Statutory Construction* § 47.1 (7th ed, 2012) ("[I]t is generally accurate to assume that when people say one thing they do not mean something else.").

8. This interpretation neither conflicts with nor improperly conflates the standards delineated by child find obligations or Section 504.

### III. APPLICATION OF LAW TO FACTS

1. The Court finds that the Expedited Decision is thorough, impartial, well-reasoned, and sensitive to the complex educational policy issues presented. The ALJ gave an extensive factual history and analyzed each disputed question with reference to the evidence presented by the parties. The ALJ's conclusions are therefore to be accorded all deference allowed by the Court's discretion.

2. The Court agrees with the ALJ's conclusion that AUHSD had a "basis of knowledge" that J.E. was a child with a disability pursuant to 20 U.S.C. § 1415(k)(5)(B)(iii) prior to the disciplinary proceedings that resulted in J.E.'s removal from Kennedy.

3. At the Section 504 plan meeting, J.E.'s teachers communicated specific concerns to a school administrator about a worrisome pattern of behavior that interfered with J.E.'s educational experience. J.E. was regularly unable to sit through an entire period of class and exhibited obviously anxious behavior, like the panic attack. An unmodified classroom environment was plainly too taxing for his emotional stability. He was also nearly failing certain courses and unable to complete his work. At least one of J.E.'s teacher's, Mr. Wiskus, expressed these concerns to the same administrator, Mr. Nasouf, at an earlier date. Critically, Mr. Nasouf was also made aware of J.E.'s psychiatric hospitalization and suicide attempt at the meeting.

4. Based on the content of these communications, AUHSD had a "basis of knowledge" that J.E. was a child with a disability under the IDEA. Indeed, J.E.'s emotional disturbance would be apparent to a lay person observing the meeting. The fact that the communications occurred, in part, at a Section 504 plan meeting, does not strip them of their effect under the IDEA.

5. Because AUHSD had a "basis of knowledge" that J.E. was a child with a disability prior to the disciplinary action that resulted in his removal, J.E. was entitled to the procedural protections offered by the IDEA, including a manifestation determination hearing (the outcome of which is not before the Court).

6. In light of this conclusion, the Court need not address J.E.'s arguments that other bases for "deemed knowledge" were present. And because the communications at the Section 504 plan meeting were sufficient to trigger "deemed knowledge" under IDEA, the Court also need not address the ALJ's apparent reliance on post-plan developments to support the Expedited Decision.

7. In its Order dated May 6, 2013 (Docket No. 38), this Court expanded the record to include the Non-Expedited Decision of the ALJ, referenced in Finding of Fact No. 20, *supra*. Obviously, the Non-Expedited Decision is highly consistent with these Findings of Fact and Conclusions of Law. The Court, however, would have reached the same verdict even if the record did not contain the Non-Expedited Decision.

## IV.   VERDICT

The Court finds and rules as follows:

On Plaintiff's Claim 1 for reversal of the expedited due process hearing decision of May 9, 2012: In favor of Defendant.

The Court will enter a separate judgment pursuant to Federal Rule of Civil Procedure 54 and 58(b).

Dated:  May 21, 2013

MICHAEL W. FITZGERALD
United States District Judge